IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALFRED THOMAS GIULIANO,

       Plaintiff,

                               3:11-CV-1416-PK

v.                               OPINION AND
                               ORDER

ANCHORAGE ADVISORS, LLC,
ANCHORAGE CAPITAL GROUP,
LLC, and NEXGEN AVIATION
CAPITAL, LLC,

       Defendants.

PAPAK, Magistrate Judge:

      Former plaintiffs Evergreen International Airlines, Inc., and Evergreen International

Aviation, Inc. (collectively, "Evergreen"), filed this action against defendants Anchorage

Advisors, LLC, Anchorage Capital Group, LLC, and Nexgen Aviation Capital, LLC, on

November 22, 2011.  Evergreen amended its complaint effective August 1, 2013.  Effective April

9, 2014, following Evergreen's Chapter 7 bankruptcy, Alfred Thomas Giuliano (the "trustee")

was substituted into this action as plaintiff in Evergreen's stead.  By and through Evergreen's

amended complaint, the trustee alleges defendants' liability for: (i) intentional interference with business relations, (ii) breach of fiduciary duty, and (iii) civil conspiracy. This court has subject-matter jurisdiction over the trustee's claims based on the complete diversity of the parties and the amount in controversy.

Now before the court are defendants' motion (#120) for summary judgment as to all three of Evergreen's claims, the trustee's motion (#123) for partial summary judgment as to Evergreen's claim for breach of fiduciary duty only, and the trustees' motion (#155) to strike certain evidence upon which defendants rely in support of their motion for summary judgment. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, the trustee's motion (#155) to strike is denied as discussed below, the trustee's motion (#123) for partial summary judgment is denied, and defendants' motion (#120) for summary judgment is granted.

## LEGAL STANDARDS

### I.    Cross-Motions for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient

admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also*, *e.g.*, *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## II.     Motion to Strike

### A.     Federal Civil Procedure Rule 12(f)

Federal Civil Procedure Rule 12 provides that the district courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on their own initiative or pursuant to a party's motion. Fed. R. Civ. P. 12(f). The disposition of a

motion to strike is within the discretion of the district court. *See Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990). Motions to strike are disfavored and infrequently granted. *See Stabilisierungsfonds Für Wein v. Kaiser, Stuhl Wind Distribs. Pty., Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), *abrogated on other grounds by Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

## B. Inherent Power

It is well established that the district courts enjoy an inherent power to manage and control their own dockets. *See, e.g., Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (affirming "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). It is clear that this inherent power includes the authority to sanction procedural impropriety in an appropriate manner. *See, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (noting that "[a] primary aspect" of the courts' inherent power "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process;" holding that because "outright dismissal of a lawsuit . . . is within the court's discretion," in consequence less severe sanctions are "undoubtedly within a court's inherent power as well"); *Atchison, T. & S.F. Ry. v. Hercules Inc.*, 146 F.3d 1071, 1074 (9th Cir. 1998) ("well established that district courts have inherent power to control their dockets and may impose sanctions, including dismissal, in the exercise of that discretion") (citations, internal quotation marks omitted); *see also Lamos v. Astrue*, 2008 U.S. App. LEXIS 9143 (9th Cir. 2008) (unpublished disposition) (affirming inherent power of the courts to strike documents other than pleadings from the docket); *Centillium Communs., Inc. v. Atl. Mut. Ins. Co.*, 2008 U.S. Dist.

LEXIS 20719 (D. Cal. 2008) (striking a procedurally improper motion pursuant to the court's inherent power).

## MATERIAL FACTS

### I.  The Parties

Former plaintiffs Evergreen International Airlines, Inc. ("Evergreen Airlines"), and Evergreen International Aviation, Inc. ("Evergreen Aviation"), are each Oregon corporations which at all material times maintained their principal places of business in McMinnville, Oregon. Prior to the former plaintiffs' voluntary Chapter 7 bankruptcy of December 31, 2013, Evergreen Airlines was a cargo airline that operated contract freight services and offered chartered and scheduled flights and so-called "wet lease" services, and Evergreen Aviation was an aviation services company primarily providing commercial and forestry helicopter services.  Since not later than December 31, 2013, both Evergreen Airlines and Evergreen Aviation have ceased all business operations.

Each former plaintiff was at all material times a privately owned company the majority of the shares of which were held by their founder, Delford Smith, and the remainder of the shares of which were held by a member of Smith's immediate family.  Prior to cessation of the plaintiff entities' operations, Smith exercised control over each company's day-to-day operations, with authority to appoint members of each company's board of directors, to hire and fire employees, and to make final decisions regarding the financing and acquisition of aircraft.

Defendant Anchorage Advisors, LLC, was a Delaware limited liability company with its principal place of business in New York, New York.  Defendant Anchorage Capital Group, LLC (collectively with Anchorage Advisors, LLC, "Anchorage"), the successor-in-interest to

Anchorage Advisors, LLC, is likewise a Delaware limited liability company with its principal place of business in New York, New York. Defendant NexGen Aviation Capital, LLC, is a Delaware limited liability company with its principal place of business in Bedford, New York. The defendants are investment firms specializing non-exclusively in the aviation industry.

## II.    The Parties' Dispute[1]

In or around August 2006, third party Avion Aircraft Trading HF (an Icelandic company headquartered in Iceland; hereinafter, "Avion") entered into three separate agreements with third party Société Air France (a French company headquartered in France; hereinafter, "Air France"), each for the purchase of a 747-400 airplane (collectively, the "aircraft") by Avion from Air France. Collectively, the three Avion/Air France agreements provided that Avion would purchase the first of the three aircraft from Air France on October 31, 2009, the second on October 31, 2010, and the third on November 30, 2010. The Avion/Air France agreements further provided that Avion would pay a deposit of $4 million toward the purchase of each one of the three aircraft. Accordingly, Avion paid Air France a total deposit of $12 million in or around August 2006 toward the purchase of the three aircraft.

In October 2006, at a time when Evergreen carried a burden of approximately $240 million in first-lien debt and approximately $100 million in second-lien debt, Evergreen entered into a refinancing arrangement with its primary lender, Credit Suisse. Pursuant to that refinancing arrangement, Evergreen agreed to the imposition of strict covenants regarding its debt and EBITDA ratios, capital expenditures, and free cash flow, including a five-year financial

---

[1] Except as expressly noted below, the facts set forth in the following recital are either undisputed or construed in accordance with the requirements of Federal Civil Procedure Rule 56 governing cross-motions for summary adjudication.

plan with mandatory growth and financial milestones.  *See* Declaration of Michael G. Davies

("Davies Decl."), Exh. E at 32:2 – 37:10, 100:11 – 104:18, Exh. 65, Exh. 66.

In August 2007, Evergreen entered into three separate contracts with Avion, each for the

purchase by Evergreen from Avion of one of the three 747-400 aircraft that were the subjects of

the Avion/Air France agreements, respectively for $50 million, $48 million, and $50 million.

*See* Davies Decl., Exhs. 46-48.  Each of the Evergreen/Avion contracts provided that it was to be

governed by New York law.  At the time Evergreen and Avion entered into the Evergreen/Avion

contracts, Avion had not yet taken possession of any of the three aircraft from Air France.

Pursuant to the Evergreen/Avion contracts, in or around August 2007 Evergreen paid Avion a

deposit of $5 million toward the purchase of each of the three aircraft, or a total deposit of $15

million.  Under the Evergreen/Avion contracts, Avion was obliged to deliver to Evergreen the

747-400 airplane bearing Serial No. 25238 on October 31, 2009, the 747-400 airplane bearing

Serial No. 25302 on October 31, 2010, and the 747-400 airplane bearing Serial No. 25630 on

November 30, 2010, the same dates that Avion would receive each of the aircraft from Air

France under the Avion/Air France agreements.

Notwithstanding that the Evergreen/Avion agreements provided that Evergreen would

purchase the aircraft directly from Avion, from the outset of the Evergreen/Avion business

relationship, Evergreen contemplated that it would assign its purchase rights under the

Evergreen/Avion contracts to a third party, and then lease the aircraft from that third party for its

own business purposes under an operational lease.  After entering into the Evergreen/Avion

contracts, Evergreen immediately began the process of identifying a third party willing and able

to serve as purchaser and operating lessor of the aircraft.  In August 2007, Evergreen approached

third party Dubai Aerospace and spent months in negotiations to determine if that company could meet Evergreen's needs. Ultimately those negotiations failed, in part because Dubai Aerospace would have required Evergreen to make certain deposits toward the purchase of the aircraft that Evergreen was unable to do under the terms of its covenants with Credit Suisse.

By not later than the first quarter of 2009, Evergreen was aware that it was not in compliance with its covenants with Credit Suisse, and that in consequence it was strictly forbidden under those covenants either to expend or to borrow the capital necessary to purchase any of the aircraft from Avion. As a result, Evergreen was aware that the only practical means available to it of obtaining the use of the aircraft it had contracted to purchase from Avion was to arrange an "off the books" operating lease. *See* Davies Decl., Exh E at 34:23 – 37:10. Moreover, Evergreen estimated that such an arrangement would only be profitable to it in the event its monthly payments under such a leasing arrangement totaled a maximum of approximately $500,000 for each aircraft. *See* Davies Decl., Exh E at 39:11 – 40:3.

In May 2009, Evergreen approached Air France directly to determine whether Air France would be willing to lease the aircraft to it until such time as Evergreen was able to finance their purchase. Air France flatly rejected any such arrangement, making clear its position that, under the Avion/Air France agreements, it had (and would exercise) the right to retain Avion's deposit of $4 million per aircraft and to seek a new buyer for the aircraft in the event of Avion's failure to purchase the aircraft by the agreed-upon dates.

Evergreen next entered into negotiations with Fulcrum Aviation Group, resulting by October 2009 in a memorandum of understanding. Under the Fulcrum memorandum of understanding, Fulcrum would provide financing to Delford Smith who would then personally

purchase the aircraft and lease them to Evergreen at monthly rates ranging from approximately $480,000 to $690,000. In parallel with that contemplated arrangement, Evergreen retained the services of a broker, BDM Financial Services ("BDM"), to find alternative financing. Under its arrangement with Evergreen, in the event it was successful in obtaining financing, BDM would receive 1% of the financed amount of the first financed aircraft, and 0.75% of the financed amount of any additional financed aircraft. BDM sought financing for the purchase of the aircraft from entities including Huntington Financial Group, Compass Capital, Varilease, VX Financial, Carval Capital, and Goldman Sachs, in each case without success.

By late 2009 (if not before), Avion was experiencing its own difficulties in financing the purchase of the first of the three aircraft from Air France. Avion successfully negotiated with Air France to obtain its forbearance in refraining from declaring Avion in default under the first of the three Avion/Air France agreements, in order to permit Avion additional time to finance the contemplated purchase. When Avion was unable to effect the purchase of the first airplane from Air France by October 31, 2009, and was consequently unable to deliver that airplane to Evergreen by the agreed-upon date, Evergreen forebore (in its turn) to declare Avion in default of the first Evergreen/Avion contract.

In early December 2009, Fulcrum Aviation Group advised Evergreen that it had been unable to arrange the financing contemplated under the Fulcrum memorandum of understanding. For that reason Evergreen's contemplated arrangement with Fulcrum collapsed.

In early January 2010, BDM initiated contact with Aziz Hassanali, a senior analyst at Anchorage, to determine whether Anchorage might finance the purchase of the aircraft. Hassanali requested further information, and in the meantime contacted Farhood Azima,

principal of NexGen, to inquire whether NexGen would be interested in the opportunity. Hassanali initially proposed through BDM that Anchorage and NexGen would purchase the aircraft and lease them to Evergreen under a ten-year lease at a monthly rate of $700,000, and Evergreen's Chief Financial Officer Don Lachman responded that Evergreen could not make a deal work unless the monthly lease payments were within the range from $475,000 to $525,000.

On January 26, 2010, Azima sent Evergreen a term sheet proposing an arrangement under which NexGen would accept assignment of Evergeen's purchase rights under the first of the three Evergreen/Avion contracts, would purchase the first of the three aircraft pursuant to that assignment at an assumed net purchase price of $34 million,[2] and would lease the purchased aircraft to Evergreen under a ten-year lease at a monthly rate of $600,000. Aziz' cover letter stated that the proposed terms were "for discussion purposes and subject to change to reflect improvements in the aircraft purchase transaction, as well as due diligence findings and further negotiation." Declaration of Joseph N. Akrotirianakis in support of Evergreen's motion (#123) for partial summary judgment ("Akrotirianakis Decl. I"), Exh. 29, p. 1. Similarly, the term sheet itself contained in its preamble, in an all-capitalized font, the following disclaimer:

> THIS PRELIMINARY, NON-BINDING INDICATION OF INTEREST IS NOT A COMMITMENT OF ANY KIND BY [NEXGEN] TO LEASE TO [EVERGREEN] OR OF [EVERGREEN] TO LEASE FROM [NEXGEN], TO PERFORM DUE DILIGENCE OR TO CONDUCT OR CONTINUE ANY DISCUSSIONS OR NEGOTIATIONS CONCERNING A POTENTIAL TRANSACTION INVOLVING ANY ASSETS, AND IS NOT TO BE CONSTRUED AS SUCH. [NEXGEN] AND [EVERGREEN] MAY

---

[2] The parties do not explain how defendants arrived at their "assumed net purchase price" of $34 million, given the prices Avion had agreed to pay for those same aircraft under the Avion/Air France Agreements. Presumably, the parties understood or had reason to believe that Air France would be willing to accept a significantly lower per-aircraft price in the event of Avion's default on its agreements.

DISCONTINUE ANY SUCH DISCUSSIONS OR NEGOTIATIONS AT ANY TIME, WITH OR WITHOUT NOTICE, IN EACH OF THEIR SOLE DISCRETION.

*Id.* at 2. Aziz stated in his cover letter that "although th[e] term sheet contemplate[d] a single aircraft lease, [defendants] would be interested in additional aircraft under similar terms." *Id.* at 1. In addition, the term sheet closed with the additional disclaimer that:

> This Letter of Intent does not constitute a lease, offer to lease or agreement to lease the Aircraft. No such binding agreement or offer shall exist until the parties enter into definitive agreements for such lease, and no lease shall occur until all conditions precedent as set forth in such definitive agreements are met or waived and a closing thereunder occurs.

*Id.* at 6. By its terms, the proposal would remain open until March 10, 2010.

Following its receipt of NexGen's proposed term sheet, Evergreen continued seeking alternative financing arrangements, including through Fulcrum Aviation Group and through renewed direct approaches to Air France, without success. During this time, Evergreen learned that it would lose a lucrative contract it had with the Boeing Company, which would entail Evergreen's loss of $45 million in revenue and $8 million in free cash flow. Evergreen did not advise defendants in advance of this impending loss, nor did it advise defendants of the lost contract when it ultimately occurred, at some time in or around February 2010. Simultaneously, Evergreen and defendants continued to negotiate the arrangement first proposed by NexGen on January 26, 2010.

On February 4, 2010, Azima sent Hassanali an email message indicating the desirability of keeping Avion a part of the deal rather than give that company an incentive "to default and step out of it," since Avion had "the best relationship with A[ir] F[rance]" and "the best chance to negotiate a lower price," and because that arrangement would have Avion "working with

[defendants] instead of against [them]."  Declaration of C. Dana Hobart ("Hobart Decl."), Exh. 79 at 1, 2.

On March 5, 2010, defendants and Evergreen agreed to and signed a final term sheet (the parties' "letter of intent" or "LOI") summarizing the results of their negotiations.  *See* Declaration of Farhood Azima ("Azima Decl."), Exh. 32.  According to the terms proposed in the parties' letter of intent, NexGen would purchase the first aircraft for an assumed net purchase price of $34 million pursuant to an assignment of Evergreen's purchase rights under the first of the Evergreen/Avion contracts, and would lease the aircraft to Evergreen at a monthly rate of $568,000 "or a Lease Rate Factor of approximately 1.67% of the Net Purchase Price" for a period of ten years.  *Id.* at 1, 2.  The LOI provided that in connection with such leasing arrangement, Evergreen would pay NexGen a security deposit in the amount of two months' rent on the aircraft.  *See id.* at 3.  The LOI contained the same two disclaimers of commitment quoted above from NexGen's first proposed term sheet dated January 26, 2010.  *See id.* at 1, 5.

The LOI further provided that, in the event defendants' net purchase price was reduced below $34 million, "the rental rate w[ould] be reduced to reflect the reduced purchase price," presumably in accordance with the "Lease Rate Factor" noted above.  *See id.* at 1, 2.  The LOI further provided that it would "be a condition precedent to [NexGen]'s obligation to lease the Aircraft to [Evergreen] on the terms listed [t]herein, that there shall not have been any material change in [Evergreen]'s financial condition. . . ."  *Id.* at 4.  The LOI additionally contained an "exclusivity" provision pursuant to which Evergreen agreed to refrain for a period of 27 days

from negotiating with third parties to obtain financing for the purchase of the aircraft.[3] *See id.* at 5. Also on March 5, 2010, Evergreen first advised defendants that it had lost the Boeing contract.[4]

In mid-March 2010, representatives of Evergreen, the defendants, Avion, and Air France were all present at an industry conference in Orlando, Florida. Defendants, Avion, and Air France met privately over the course of the conference to discuss an arrangement pursuant to which defendants and Avion would jointly purchase the aircraft. Following that meeting, on March 19, 2010, NexGen and Avion entered into a letter agreement pursuant to which Avion would have a financial interest in any transaction for the purchase of the aircraft from Air France.[5] Also on March 19, 2010, NexGen emailed a written proposal to Air France, pursuant to which "a special purpose entity funded by NexGen, Anchorage and Avion" would purchase all three aircraft directly from Air France for a total price of $72 million (or an average price of $24 million per aircraft, a substantial reduction from the previously contemplated per-aircraft price). Azima Decl., Exh 121. The proposal expressly stated that the offer it contained was "<u>not</u>

---

[3] The parties had earlier negotiated an alternative provision pursuant to which Evergreen would instead pay defendants a fee in the amount of $350,000 in the event it obtained alternative financing, but ultimately Evergreen agreed to the exclusivity provision.

[4] In connection with a lawsuit Evergreen subsequently filed against Boeing, Evergreen estimated its losses from the lost contract at $175 million.

[5] Although the trustee repeatedly asserts that the March 19, 2010, letter agreement between Avion and NexGen provided that Avion would receive a 10% interest in the transaction, in fact the letter agreement provided that Avion would have the right to invest up to 50% of the capitalization of a special-purpose company formed to purchase the aircraft from Air France, to which it was contemplated that Avion would assign its rights under the Avion/Air France agreements. According to the terms of the letter agreement, Avion's right to do so was expressly contingent on "reaching acceptable agreements with Anchorage Advisors, Air France and Evergreen."

subject" to any contingency regarding financing.  *Id.* at 3 (emphasis original).  In addition, the

proposal expressly stated:

> Our offer is <u>not</u> subject to our having a customer for the aircraft.  As we have
> discussed, we are currently exclusively pursuing an onward lease to
> Evergreen . . . , but we will close our transaction with you irrespective of the
> outcome of those discussions.

*Id.* at 3 (emphasis original.)  Defendants forwarded a copy of the proposal to Evergreen on that

same day (March 19, 2010), including defendants' assertions that the proposed transactions with

Air France were in no way contingent on defendants reaching agreement with Evergreen

regarding the terms of the parties' proposed lease arrangement.

On March 23, 2010, Aziz and Hassanali discussed the desirability of obtaining an

extension of the exclusivity provision of the LOI, because "a favorable response" from Air

France might induce Evergreen "to shop around" once the exclusivity period ended on April 1,

2010.  Akrotirianakis Decl. I, Exh. 44 at 1.  Defendants privately agreed not to give Evergreen

"any visibility into" defendants' negotiations with Air France prior to such extension.  Hobart

Decl., Exh. 74 at 1.  On March 26, 2010, the parties agreed to extend the exclusivity period

through April 30, 2010.

On March 31, 2010, Air France agreed to defendants' and Avion's joint proposal.  That

same day, NexGen forwarded Air France's response to Evergreen (including therewith

defendants' advice to Air France that the transaction would go forward regardless of whether

defendants and Evergreen agreed to a leasing arrangement).  Prior to forwarding Air France's

response to Evergreen, defendants privately discussed and rejected the option of putting off

advising Evergreen of Air France's response for 24 hours.  *See* Hobart Decl., Exh. 48 at 2, 1.

On April 6, 2010, Anchorage for the first time sent Evergreen a proposed lease agreement, pursuant to which Evergreen would pay NexGen a monthly lease payment of $575,000 per month for the first five years of the lease, and $425,000 per month for the last five years of the lease.[6] *See* Declaration of Aziz Hassanali ("Hassanali Decl."), Exh. 74. In addition, the proposed lease agreement required Evergreen to pay a security deposit equal to four months' rent, whereas (as noted above) the parties' letter of intent had contemplated a security deposit in the amount of two months' rent. Anchorage's cover message to Evergreen included the advice that, "[i]n terms of Air France, we are working on entering into a more definitive termsheet on the purchase of the aircraft" and that defendants would "keep [Evergreen] posted as [they] progress with [Air France]." *Id.* at 1.

On April 13, 2010, defendants sent Air France a draft letter of intent regarding defendants' joint proposal with Avion. Defendants, Avion, and Air France thereafter continued to negotiate the provisions of their agreement. By April 19, 2010, those parties were close to an agreement.

On April 22, 2010, Evergreen sent to the defendants a revised proposed lease agreement, which provided for uniform monthly lease payments in the amount of 1.67% of the net purchase price of the aircraft to defendants, and for reduction of the security deposit to two months' rent. *See id.*, Exh. 75. After receiving Evergreen's proposed draft, Azima sent an email message to Hassanali instructing him to "make sure we have frozen comm[unication]s with Evergreen. I

---

[6] The average monthly lease payment over the life of the proposed ten-year lease would therefore have been $500,000. This average proposed payment is less than the proposed $568,000 set forth in the LOI, but in excess of the Lease Rate Factor of 1.67% of the then-contemplated actual purchase price of $24 million ($400,800).

don't want any interaction with them on any level until you and I [have] formulated a gameplan."
Hobart Decl., Exh. 50 at 1.

It appears that, over the next few days, Air France considered offers to purchase the
aircraft from unrelated third parties, to the extent that its near-agreement with the defendants and
Avion was thrown into question.  When, by April 26, 2010, the negotiations among defendants,
Avion, and Air France appeared to be back on track, Hassanali sent an email message to an
Achorage employee stating "On A[ir] F[rance], we secured the deal thank God."  Hobart Decl.,
Exh. 81 at 1.  That same day, Azima sent an email message to third-party Paul Sawhny, a
"technical advisor" to defendants, stating that Hassanali "keeps wanting to grind [Evergreen] and
get them to cave," presumably regarding the lease rate factor and security deposit provisions of
the lease under negotiation.  *Id.*, Exh. 82 at 1.

On April 30, 2010, Azima traveled to Evergreen's McMinnville headquarters to negotiate
the terms of the lease with Evergreen.  Although some of Evergreen's executives believed that
Evergreen should accept defendants' proposed lease arrangement, Smith refused to accept
defendants' requested monthly lease rate.  It is undisputed that at that meeting Azima indicated to
Evergreen that, in the event Evergreen refused to agree to defendants' proposed terms, defendants
would go forward with the purchase from Air France.  Evergreen nevertheless refused to accept
defendants' terms.

On or around that same day, Sawhny advised defendants that he knew of a potential buyer
for the aircraft.  Sawhny did not at that time disclose to defendants the identity of the potential
buyer.

Notwithstanding the parties' failure to reach an agreement during Azima's visit, and

notwithstanding the possibility that a potential buyer was interested in acquiring the aircraft, on May 6, 2010, defendants sent Evergreen a proposed lease agreement under which Evergreen would pay a uniform monthly rent amount of $427,000.[7]  Hassanali Decl., Exh. 80.

On or around May 10, 2010, before Evergreen responded to defendants' new proposed lease terms, defendants entered into a compensation agreement with Sawhny pursuant to which Sawhny would receive a commission on any sale of the aircraft to any party he identified.  After entering into the agreement, Sawhny advised defendants that the potential buyer he had identified was third-party National Air Cargo ("NAC").  Simultaneously with continuing their negotiations with Evergreen regarding the proposed lease agreement, defendants began negotiating the possible sale of the aircraft to NAC.

At the same time that Evergreen was considering the proposed lease arrangement, Evergreen was simultaneously bidding on one or more of five 747-400 aircraft being sold by Japan Airlines, and seeking financing in connection with that potential purchase.  In addition, Smith was seeking potential buyers for Evergreen Airlines in an effort to raise cash.  At that time, all or most of Evergreen's executives other than Smith expressed themselves in favor of accepting defendants' offer of May 6, 2010, but Smith never became willing to accept defendants' proposed terms.

On May 17, 2010, defendants, Avion, and Air France executed a letter of intent to purchase all three Air France aircraft at a total purchase price of $73 million, with Avion's agreement to convert its $12 million in deposits to down payments under new purchase

---

[7]  This proposed monthly payment is approximately $20,000 in excess of the Lease Rate Factor of 1.67% of the $24.33 million per-aircraft price actually ultimately paid by defendants to Air France ($406,366).

agreements.  *See* Azima Decl., Exh. 1525.  The agreement with Air France once again expressly

stated that a deal with Evergreen would not be a condition precedent to the transaction.  *See id.* at

3.  On May 19, 2010, Air France produced draft purchase agreements according to the terms of

its letter of intent with defendants and Avion.  However, Avion, which at no material time had

possessed the financial wherewithal to participate in the proposed special purpose purchasing

entity, at this juncture definitively advised Air France of its financial incapacity.  Defendants and

Avion advised Air France that a third party, Banyon Limited ("Banyon"), was willing to step into

the proposed arrangement in Avion's place.  In response, Air France expressed a preference for

terminating its agreements with Avion and executing new purchase agreements.  Defendants and

Avion agreed, and on May 28, 2010, Air France produced drafts of the proposed new purchase

agreements including Banyon in lieu of Avion.

That same day, on May 28, 2010, NAC entered into a letter of intent with defendants and

Banyon for the purchase of the aircraft for a total price of $120.45 million.  The parties agreed

that the sellers would not sell or lease the aircraft to any other party during the effective period of

the proposal, with the express exception of Evergreen, during a period of five business days.[8]

Meanwhile, Air France prepared a termination agreement pursuant to which Avion would

agree to terminate its agreements with Air France.  Avion executed the agreement on June 11,

2010, and on that same date signed a letter by and through which it stated that it was terminating

its right to purchase the aircraft under the Avion/Air France agreements, due to its inability to

---

[8]  Defendants and Banyon had originally sought to include a provision requiring NAC to
share in any payment of damages to Evergreen arising in connection with the sale of the aircraft
to NAC, but ultimately agreed not to include that provision in exchange for raising NAC's
purchase price from $120 million to $120.45 million.

fulfill its obligations thereunder. The letter further stated that Avion's inability was due to Evergreen's breach of the Evergreen/Avion contracts, a characterization that Evergreen vigorously disputes.

On June 16, 2010, a special-purpose company funded by defendants and Banyon formally entered into a purchase agreement with Air France for the three aircraft. The total price for all three aircraft was approximately $72.78 million. On June 23, 2010, the special purpose company entered into a formal agreement to sell the aircraft to NAC.

On June 24, 2010, Evergreen advised defendants that Evergreen remained interested in further negotiating the lease of the aircraft from defendants, and learned in response that the aircraft were to be sold to NAC. This action followed.[9]

On December 31, 2013 – during the pendency of this action and after defendants' currently pending motion (#120) for summary judgment and Evergreen's currently pending motion (#123) for partial summary judgment were filed – both Evergreen Airlines and Evergreen Aviation filed voluntary petitions for Chapter 7 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware (the "bankruptcy court"), apparently to avoid involuntary bankruptcy proceedings initiated against them by one or more of Evergreen's creditors in New York. On January 2, 2014, Alfred Thomas Giuliano was appointed as Chapter 7 trustee of Evergreen's estate. Effective April 11, 2014, Giuliano joined this action as the real party in interest in lieu of Evergreen.

---

[9] In addition, Evergreen brought a separate action against Avion, in connection with which it was awarded a default judgment against Avion in the amount of $15 million, the amount of the deposit Evergreen paid Avion under the Evergreen/Avion contracts.

**ANALYSIS**

## I.     The Trustee's Motion (#155) to Strike

By and through his motion to strike, the trustee objects to 44 testimonial statements made in the declarations of Hassanali, Azima, and Michael Bay and in the depositions of Delford Smith, Michael Bay, Ryan Smith, Timothy Wahlberg, Air France employee Patrick Halluin, Brian Maurer, Avion principal Magnus Thorstenn, and Bill McElfresh, as well as to 10 other pieces of documentary evidence, including copies of email messages and of Evergreen's own complaint filed in its claim against the Boeing Company, and, additionally, to three argumentative statements contained in defendants' briefing which the trustee asserts are unsupported by evidence.  The trustee's objections to these 57 pieces of evidence are summarized in a chart attached as an exhibit to Evergreen's motion to strike.

A large proportion of the trustee's objections are premised on the purported irrelevance, argumentativeness, and/or speculativeness of defendants' evidentiary proffers.  As such, to the extent (if any) that some or all such objections may be accurate, they are to that extent necessarily moot, in that summary judgment cannot be granted on the basis of irrelevant evidence, argument, or speculation.  *See* Fed. R. Civ. P. 56(c), (d), (e); *see also*, *e.g.*, *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Because evidentiary objection on such grounds is necessarily superfluous, the motion to strike is denied to the extent premised on trustee's objections regarding irrelevance, argumentativeness, and/or speculativeness.

Several of the trustee's additional objections are premised on the so-called  "best evidence" rule, and are argued on the grounds that no declarant or deponent should be permitted to testify to the contents of a document when that document is available to speak for itself.  This

is not a correct application of the best evidence rule. Pursuant to the rule, the contents of a

writing cannot be proved by testimonial evidence if the document itself is not also produced. *See*

*United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004). Where, as in every instance here,

the subject document is in fact offered into evidence, the rule does not preclude testimony

regarding its contents, whether or not such testimony would be superfluous. *See id.* The motion

to strike is therefore denied to the extent premised on the trustee's "best evidence" objections.[10]

Certain of the trustee's objections are in regard to the defendants' reliance on what the

trustee characterizes as improper character evidence, specifically as to the character of Delford

Smith. In each instance, these objections are not well taken. The evidence has not been offered

to prove that Smith acted in accordance with his purported character. The motion is therefore

denied to the extent premised on purportedly improper character evidence.

The remainder of the trustee's objections are in regard to purported hearsay contained

within witness testimony offered by defendants. The great majority of these objections are not

well taken, the referenced testimony either not being offered to establish the truth of the offered

statement (*i.e.*, offers made in the course of negotiations) or clearly falling under a recognized

exception to the hearsay rule. The motion is therefore denied to the extent premised on

application of the rule against hearsay.

Notwithstanding the denial of the trustee's motion, irrelevant, speculative, argumentative,

and inadmissible evidence has not been considered and will not be considered in analyzing the

---

[10] Notwithstanding the foregoing, in analyzing the parties' arguments in connection with the pending cross-motions for summary adjudication I have not relied on any witness testimony regarding the content of documents offered into evidence, but rather have relied exclusively on the documents themselves.

merits of the parties' pending cross-motions for summary adjudication.

## II. The Parties' Cross-Motions for Summary Adjudication

Because the contested question whether defendants were at material times in a fiduciary relationship with Evergreen underlies at least two, and arguably all three of the trustee's claims against defendants, I turn first in analyzing the merits of the parties' motions for summary adjudication to the parties' cross-motions regarding trustee's breach of fiduciary duty claim, which raises that question most centrally. I then consider, in turn, defendants' motion regarding the trustee's intentional interference and conspiracy claims.

### A. Defendants' Motion (#120) for Summary Judgment and the Trustee's Motion (#123) for Partial Summary Judgment as to the Trustee's Breach of Fiduciary Duty Claim

The gravamen of the trustee's breach of fiduciary duty claim is that defendants engaged in "self-dealing" and/or intentionally deceived Evergreen in order to usurp an opportunity for profit that, as purported fiduciaries, defendants should have made available to Evergreen. The trustee takes the position that defendants were in a fiduciary relationship with Evergreen because, in connection with the parties' letter of intent:

> (a) Evergreen surrendered to Defendants complete control over all negotiations relating to the Aircraft; (b) the purpose of the parties' relationship was to further the economic interests of Evergreen which was the purpose for which Defendants were engaged by Evergreen; (c) Defendants assumed the role of a trustee when Evergreen gave control to Defendants of Evergreen's $5 million per-Aircraft deposit to use to reduce the purchase price Defendants would pay to Air France acquire the Aircraft; and (d) Evergreen was required to assign its purchase rights under the Evergreen/Avion Agreements to Defendants, who became Evergreen's exclusive agent to negotiate directly with Avion to obtain the best possible terms of such an assignment for the benefit of Evergreen.

First Amended Complaint, ¶ 102. Both sets of parties move for summary adjudication of the

trustee's breach of fiduciary duty claim.

### 1. Choice-of-Law Determination Regarding the Trustee's Breach of Fiduciary Duty Claim

The parties dispute whether the trustee's fiduciary duty claim should be governed by Oregon law or New York law, with defendants arguing for application of New York law, and Evergreen arguing for application of Oregon law. As a preliminary matter, I note that the parties' LOI expressly provides that its own provisions and the provisions of any lease entered into by the parties in connection with the LOI were to be "governed by and construed in accordance with the laws of the State of New York." This choice-of-law provision does not govern the conflict-of-law analysis the court is called upon to make, however, because whatever law governs the provisions of the letter of intent, the court must look beyond the contractual provisions to principles of the common law to determine whether the parties' contractual arrangement (and other dealings), however construed, give rise to a fiduciary relationship. I therefore give full effect to the choice-of-law provision contained in the LOI, but nevertheless proceed to the conflict-of-law analysis.

When sitting in diversity, a federal court must apply the conflict-of-law rules of its forum state to determine which law governs the dispute before it. *See Mortensen v. Bresnan Communs., LLC*, 722 F.3d 1151, 1161 (9th Cir. 2013) (citations omitted). Under Oregon conflict-of-law rules, the "necessary threshold determination [is] whether there is a material difference between Oregon substantive law and the law of the other forum." *Waller v. Auto-Owners Ins. Co.*, 174 Or. App. 471, 475 (2001). The Oregon case law is clear that where no material difference exists between Oregon law and the law of the candidate alternative forum,

the courts will apply Oregon law without regard to the relative significance of the relationship between the dispute and the various candidate fora. *See id.*, *citing Angelini v. Delaney*, 156 Or. App. 293, 300 (1998). Moreover, it is the burden of the party or parties advocating the application of a different jurisdiction's law to identify material differences between that jurisdiction's law and Oregon's, and the Oregon courts will apply Oregon law in the event no party identifies any material distinctions, without regard to whether such distinctions in fact exist. *See id.*; *see also Angelini*, 156 Or. App. at 300 (where the parties have not identified material distinctions, "it is not [the] obligation [of the courts] to cast around the law of [an alternate forum] in quest of possible material differences"); *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 303-304 (2007) (argument that the law of an alternative forum might govern the parties' dispute triggers no duty in the court to conduct a conflict-of-law analysis in the absence of express identification of material differences between Oregon law and that of the alternative forum).

Here, the parties have not identified any material difference between New York law and Oregon law regarding the creation of a fiduciary relationship, the scope of the duty or duties owed by a fiduciary to its principal where such a relationship exists, or the elements of a cause of action for the breach of such a duty (and my own review of the applicable New York and Oregon case law suggests no material distinctions). In consequence, although wherever applicable I construe the provisions of the parties' LOI under New York law, I consider the merits of the trustee's breach of fiduciary duty claim under Oregon law.

### 2.     Analysis of the Trustee's Breach of Fiduciary Duty Claim

Under Oregon law, "[t]o recover for breach of fiduciary duty, the plaintiff must prove,

one, the existence of a fiduciary relationship between the parties; two, a breach of one or more of the fiduciary duties arising out of that relationship; and three, damage to the plaintiff resulting from a breach of one or more of those duties." *Evergreen West Bus. Ctr., LLC v. Emmert*, 254 Or. App. 361, 367 (2012). The parties' dispute regarding the trustee's breach of fiduciary duty claim centers almost exclusively on the question whether a fiduciary relationship existed at any material time between Evergreen and one or more of the defendants.

A fiduciary duty exists under Oregon law only where the parties are in a "special relationship" in which one party is obliged to pursue the other party's best interests. *Conway v. Pacific University*, 324 Or. 231, 237 (1996). In determining whether such a relationship exists:

> The focus [of the inquiry] is not on the subject matter of the relationship, such as one party's financial future; nor is it on whether one party, in fact, relinquished control to the other. The focus instead is on *whether the* **nature of the parties' relationship itself** *allowed one party to exercise control in the first party's best interests*. In other words, the law does not imply a tort duty simply because one party to a business relationship begins to dominate and to control the other party's financial future. Rather, the law implies a tort duty only when that relationship is of the type that, by its nature, allows one party to exercise judgment on the other party's behalf.

*Bennett v. Farmers Ins. Co.*, 332 Or. 138, 161-162 (bolded emphasis original; italicized emphasis supplied) (holding that notwithstanding plaintiff's relinquishment of financial control to the defendant, as a matter of law the facts of the parties' dealings did not give rise to a fiduciary relationship), *citing Conway*, 324 Or. at 241.

*Conway* establishes that a special relationship giving rise to a fiduciary duty exists "when one party is acting, at least in part, to further the economic interests of the other party," *Conway*, 324 Or. at 236, *citing Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 161 (1992), "[i]n other words . . . [where] the party sought to be held liable had some obligation to pursue the

interests of the other party," *id.* at 236-237. Such relationships include "certain professional relationships in which one party has a professional obligation to protect the interests of the other party," *id.* at 237, *citing Onita*, 315 Or. at 160-161, or contractual relationships of a kind that give rise to a "status upon which the general law predicates a duty independent of the terms of the contract," *id.* at 239, *quoting Georgetown Realty v. The Home Ins. Co.*, 313 Or. 97, 104 (1992). The *Conway* court made clear that where both parties act "in their *own* behalf, each for their own benefit," no such relationship exists. *Id.* at 242 (emphasis original). Similarly, the *Bennett* court reasoned in the context of a contractual arrangement potentially giving rise to a fiduciary relationship that where the contract does not suggest that the putative principal would "relinquish control over [its] business" or that the putative fiduciary would "exercise independent judgment" over the putative principal's concerns, the nature of the relationship created is "not one in which [the putative fiduciary] was to step into [the putative principal's] shoes and to manage [its] business affairs," and in consequence the parties are not in a fiduciary relationship. *Bennett*, 332 Or. at 163.

By and through the LOI, defendants and Evergreen memorialized their expressly non-binding intent to enter into an arm's-length leasing arrangement yet to be negotiated, on the assumption that prior to entering into any such relationship, the defendants would have purchased one of the aircraft at an assumed price, and taken possession of it. Although the LOI included an exclusivity provision through which Evergreen temporarily gave up its right to seek alternative means of financing the purchase or lease of the aircraft in question, Evergreen did not, either through that exclusivity provision or through any other provision of the LOI, give defendants authority to speak for Evergreen or make decisions on Evergreen's behalf, give

defendants any power over any aspect of Evergreen's business, or entrust any assets or confidential information to defendants' care or judgment. In similar vein, no provision of the LOI in any sense authorized defendants to exercise independent judgment on Evergreen's behalf as to any of Evergreen's interests, including as to the contemplated transaction with Air France or as to the contemplated leasing arrangement (in that the LOI expressly did not bind Evergreen to accept any arrangement the defendants might in the exercise of their judgment propose, without regard to whether the arrangement comported with the terms proposed in the LOI). And no provision of the LOI in any sense required defendants to pursue Evergreen's best interests (in that the letter of intent expressly provided that defendants were not bound to to take *any* action on Evergreen's behalf, including the negotiation of the lease arrangement contemplated therein).

To the contrary, the LOI created an ordinary business relationship in which the parties on each side of the transaction acted in their own interests and sought their own profits. Moreover, the course of the parties' subsequent dealings provided no grounds for Evergreen reasonably to conclude that the parties' relationship had at any time become fiduciary in nature, especially given defendants' repeated reiteration of their intention to purchase the aircraft from Air France regardless of whether their lease negotiations with Evergreen were ultimately successful. Because the LOI (together with the parties' subsequent course of dealings) did not authorize defendants to exercise independent judgment on Evergreen's behalf, bind defendants to pursue Evergreen's interests, or purport to create a "special relationship" as that term is defined in *Conway*, *supra* – or, indeed, create any enforceable relationship whatsoever between the parties – as a matter of Oregon law defendants did not at any material time owe Evergreen a fiduciary duty

of care.[11]

The trustee argues forcefully to the contrary. First and chiefly, the trustee argues that Evergreen in fact reposed "special confidence" in the defendants, and on the grounds of that actual reposition of confidence defendants became bound to act in Evergreen's best interests. However, as noted above, the *Bennett* court expressly rejected this argument, noting that whether or not parties are in a fiduciary relationship is not dependent "on whether one party, in fact, relinquished control to the other." *Bennett*, 332 Or. at 161. Instead, a relationship takes on fiduciary character only where the nature of the relationship permits one party to exercise independent judgment implicating the other's interests. *See id.* The LOI did not create such a relationship. Indeed, even assuming *arguendo* that the LOI authorized defendants to "exercise independent judgment" in their negotiations with Air France, because the LOI was expressly non-

---

[11] The same result would obtain if the trustee's breach of fiduciary duty claim were governed by New York law. The New York courts will not find that a contract creates a fiduciary relationship where the contract contains "no cognizable fiduciary terms" and does not expressly provide for any relationship of special trust. *Northeast Gen. Corp. v. Wellington Advertising*, 82 N.Y.2d 158, 162 (1993); *see also id.* at 162-165; *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*, 22 A.D.2d 595, 598 (N.Y. App. Div. 1965) ("What is, without more, a conventional business relationship, does not become a fiduciary relationship by the mere allegation").

New York courts have held that "[a]bsent extraordinary circumstances, conventional business relationships, that are the result of arms-length transactions, do not create a relationship of confidence or trust sufficient to find the existence of a fiduciary duty." *Wilhelmina Artist Mgmt., LLC v. Knowles*, 8 Misc. 3d 1012(A), 1012A (N.Y. Sup. Ct. 2005), *citing In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2nd Cir. 2002), *Oursler v Women's Interart Ctr., Inc.*, 170 A.D.2d 407 (N.Y. App. Div. 1991). "Further, a fiduciary relationship generally will not be implied between parties to a commercial transaction where the parties are each represented by counsel and other professional advisors retained to protect their interests." *Id.*, *citing Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729, 739 (2d Cir. 1984) (applying New York law).

The LOI at issue here contains no express "cognizable fiduciary terms," creates no relationship of confidence or trust, and instead creates a conventional business relationship as the result of an arms-length negotiation. As such, the New york courts would not recognize the parties' relationship as giving rise to any fiduciary duty.

binding on any party, such authority to exercise judgment could not have been of the kind that gives rise to a fiduciary relationship: Evergreen was under no obligation to accept the fruits of defendants' negotiations, or to refrain from the exercise of its own independent judgment in evaluating their merits. The fact that defendants may have had experience or connections that put them in a superior position relative to Evergreen to conduct negotiations with Air France does not impact that conclusion, because the parties' relationship was not of a nature that allowed defendants to exercise control over Evergreen's best interests. Indeed, not only did Evergreen not give defendants authority to bind Evergreen to any obligation or otherwise cede actual control over its decisionmaking to defendants, the evidence of record establishes that, during the period when Evergreen was conducting negotiations with Air France, Evergreen was independently seeking alternative arrangements for leasing 747 aircraft, including through conducting independent negotiations with Japan Airlines.

The trustee further argues that the purpose of the parties' business arrangement was at all times solely to obtain the use of the aircraft for the benefit of Evergreen's business, and that in consequence defendants necessarily served as Evergreen's fiduciaries. The premise of that argument is accurate as far as it goes, but the conclusion that the parties' relationship was fiduciary in nature does not follow therefrom. Any time a master hires another for the performance of services, the master intends to benefit from the contemplated services and the servant does not, but not every servant is fiduciary to the master. In this instance, although the successful consummation of all transactions contemplated in the LOI would have resulted in a business arrangement that would have inured to Evergreen's potential benefit, no provision of the LOI and no representation made by defendants to Evergreen suggested that defendants were

bound to pursue any interest other than their own in the course of pursuing the contemplated

arrangements. In consequence, the fact that Evergreen expected to benefit from defendants'

services is immaterial to whether the parties were in a fiduciary relationship.

Finally, the trustee cites several Oregon cases in which the courts found the parties to

have entered into a fiduciary relationship giving rise to a special duty of care, including chiefly

*Strickland v. Arnold Thomas Seed Service, Inc.*, 277 Or. 165 (1977), and *Harper v. Interstate

Brewery Co.*, 168 Or. 26 (1942)[12] Each of the trustee's cited cases is materially distinguishable

on its operative facts. In *Strickland*, alfalfa seed growers with surplus crops and "little or no

opportunity to sell" them entered into a pooling arrangement whereby one single seed dealer was

given the exclusive right to sell all crops produced during two growing years, including "the right

to possession and control of the growers' seed throughout the period that the pool was in

operation, and the sole right to determine the times and prices at which the seed would be sold."

*Strickland*, 277 Or. at 169; *see also id.* at 170 n. 4 ("the marketing agreements g[a]ve [the dealer]

virtually complete control over the pool seed"). The seed dealer agreed "to 'use its best efforts to

market Grower's seed to the best advantage.'" *Id.* at 169. The seed dealer also contributed its

own seed to the pool. *See id.* Ultimately, the seed dealer sold much of the seed, but sold all of

its own seed at a consistently higher price than the other seed in the pool. *See id.* Because the

growers gave the dealer virtually plenary control over their seed, "including the sole power to

determine the price, dates, and terms of sales," and in consequence retained "no control over any

marketing decisions and, indeed, were not kept informed of those decisions" but rather

---

[12] Because I find that defendants were never in a fiduciary relationship with Evergreen, I
do not address herein the cases the trustee relies on in support of the proposition that the parties'
purported fiduciary relationship survived the expiration of the LOI's exclusivity provision.

"surrendered . . . complete control over their crops" to the dealer, the *Strickland* court concluded that the dealer stood in a fiduciary relationship to the growers. *Id.* at 170. Here, by stark contrast, although Evergreen agreed not to seek alternative financing during the narrowly circumscribed timeframe of defendants' negotiations with Air France, Evergreen did not surrender complete control over its business to defendants, did not authorize defendants to speak for it or cause it to enter into any binding contractual arrangement, did not entrust any of its assets to defendants' care, did not receive defendants' express promise to use their best efforts to Evergreen's best advantage, and, in the event defendants performed precisely as contemplated under the LOI, was expressly under no enforceable obligation to lease the aircraft from defendants, but rather could simply walk away from the arrangement. Although the trustee argues that *Strickland*'s facts and holding are "closely analogous" to the factual and legal issues raised herein, in fact *Strickland* serves less to support the trustee's legal position than to highlight the distinctions between Evergreen's arrangement with defendants and a cognizable fiduciary relationship.

*Harper*, if anything, provides still less support for the trustee's position. In that case, the owners of a cold-storage facility authorized to distribute beer for a brewer became delinquent in their payments to the brewer. *See Harper*, 169 Or. at 26-33. The distributors entered into a contract with the brewer pursuant to which the distributors conveyed their deeds in the cold-storage facility to the brewer in the manner of a mortgage and agreed that the brewer would have the right to sell the cold-storage facility in satisfaction of the debt, paying any surplus proceeds to the distributors, in the event the distributors failed to bring their accounts up to date within 30 days. *See id.* The parties agreement expressly provided that the brewer was to use its "best

efforts" to obtain the highest possible price in the event of a sale of the facility. *Id.* The distributors failed to bring their accounts up to date, and the brewer sold the facility to a third party. *See id.* The brewer's contract of sale to the third party expressly set the sale price of the facility to the lower of a fixed price (that exceeded the amount of the distributors' debt to the brewer but was far below the alleged market value of the property and far below the amount of the distributors' equity in the property) or the specific amount of the distributors' debt to the brewer. *See id.* In consequence, there was no possibility of the sale producing surplus proceeds for the benefit of the distributors. In addition, prior to selling the property, the brewer assumed operations of the cold-storage facility and retained the profits therefrom for itself. *See id.* Based on the brewer's express promise to use its best efforts to obtain the highest possible price on the sale of the facility, and on the brewer's receipt in trust of the deeds to the facility, the *Harper* court found that the brewer owed the distributors a fiduciary duty in connection with the sale. *See id.* at 42. Here, again by stark contrast, Evergreen did not receive defendants' promise to use "best efforts" to maximize Evergreen's profits and did not entrust defendants with title to the assets that constituted Evergreen's business. The factual underpinnings of the *Harper* court's reasoning and decision are simply absent here.

Because for all of the foregoing reasons defendants did not, as a matter of law, owe Evergreen any fiduciary duty of care, it follows that they cannot be liable to Evergreen for the breach of any such duty. In consequence, the trustee's motion (#123) for partial summary judgment is denied in its entirety, and defendants' motion (#120) for summary judgment is granted as to the trustee's breach of fiduciary duty claim.

**B.     Defendants' Motion (#120) for Summary Judgment as to the Trustee's Intentional Interference Claim**

The gravamen of the trustee's intentional interference claim is that defendants intentionally induced Avion to breach the Evergreen/Avion contracts by causing Avion to terminate its purchase agreements with Air France, via the purported improper means of breaching a fiduciary duty owed to Evergreen, misappropriation of Evergreen's $15 million deposit to Avion, fraudulent misrepresentation and/or fraudulent concealment, and/or commercial bribery. Defendants move for summary adjudication of the trustee's intentional interference claim.

**1.     Choice-of-Law Determination Regarding the Trustee's Intentional Interference Claim**

Each set of parties relies upon Oregon law in support of its respective position regarding the trustee's intentional interference claim, without suggesting that the law of any alternative forum should govern. I note in this connection that the governing-law provision of the parties' letter of intent is immaterial to the choice-of-law determination regarding the trustee's intentional interference claim, which does not arise out of the LOI. I therefore apply Oregon law in considering the merits of defendants' summary judgment motion as applied to the intentional interference claim.

**2.     Analysis of the Trustee's Intentional Interference Claim**

Under Oregon law:

To state a claim for intentional interference with economic relations, a plaintiff must allege: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6)

Page 33 - OPINION AND ORDER

damages.

*Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498 (1999), *citing McGanty v. Staudenraus*, 321 Or. 532, 535 (1995).

Moreover, "[d]eliberate interference alone does not give rise to tort liability." *Id.*; *see also Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209-10 (1973) ("[A] claim [of tort liability for intentional interference with a contractual or other economic relations] is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.").

The *Northwest Natural Gas* court specified that:

> To be entitled to reach a jury, a plaintiff must not only prove that defendant[s] intentionally interfered with [its] business relationship but also that defendant had a duty of non-interference; *i.e.*, that [they] interfered for an improper purpose rather than for a legitimate one, or that defendant[s] used improper means which resulted in injury to plaintiff. Therefore, a case is made out which entitles plaintiff to go to a jury only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.

*Northwest Natural Gas*, 328 Or. at 498 (citations, internal quotation marks omitted). The court further explained that:

> [I]f liability in tort is to be based on an actor's purpose, then the purpose must be to inflict injury on the plaintiff "as such." And, **if liability in tort is based on an actor's means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law**, or, perhaps, an established standard of a trade or profession.

*Id.* (citations omitted; emphasis supplied). Under Oregon law, therefore, a third-party's interference with another party's economic relations is not improperly motivated when its

purpose is the pursuit of the third parties' own interests.  *See*, *e.g.*, *Eusterman v. Northwest Permanente, P.C.*, 204 Or. App. 224, 238 (2006) ("not improper" for a corporate party's actions to be motivated to maximize its profits); *Top Service*, 283 Or. at 212 (not improper for a party to be motivated to pursue its own business purposes "as it saw them").

Assuming *arguendo* the accuracy of the trustee's position that defendants intentionally induced Avion to breach the Evergreen/Avion contracts, the evidence of record interpreted in the light most favorable to the trustee does not support the conclusion that defendants did so through improper means or with an improper purpose.  First, there is no evidence in the record that any defendant at any time harbored a motivation to cause Evergreen harm "as such."  To the contrary, the evidentiary record suggests only that defendants were motivated to maximize their own profits.

Second, the trustee's arguments regarding improper purpose do not find support in the record.  The trustee's primary argument is that defendants interfered with Evergreen's economic relationship with Avion through breach of a variety of purported fiduciary duties they owed to Evergreen, most particularly the duties to avoid self-dealing and to avoid usurping opportunities for profit that should properly inure to Evergreen.  This argument necessarily fails because, as discussed above, defendants were never in a fiduciary relationship with Evergreen and therefore never owed Evergreen any extra-contractual fiduciary duty.

The trustee's argument that defendants interfered with Evergreen's economic relations by converting the $15 million deposit Evergreen paid to Avion toward the purchase of the aircraft is likewise necessarily unavailing (even setting aside the fact that, as a matter of logic, the purported conversion of Evergreen's deposit was at most a *result* rather than the *modality* of the

alleged interference). While it is undisputed that defendants purchased the aircraft from Air France at a price that took into account Avion's $12 million deposit to Air France (which deposit was tendered to Air France pursuant to the Avion/Air France agreements prior to the date Evergreen entered into the Evergreen/Avion contracts and tendered its $15 million deposit to Avion), the trustee has by no means established that the $12 million reduction in price constituted a conversion of Evergreen's $15 million. To the contrary, the evidence interpreted in the light most favorable to the trustee supports only the conclusion that Avion, rather than defendants, improperly retained and thereby converted Evergreen's $15 million deposit. In the complete absence of evidence that it was defendants rather than Avion that misappropriated Evergreen's deposit, a finder of fact could not reasonably conclude that defendants interfered with Evergreen's economic relations through tortious conversion.[13]

The trustee points to seven purported acts of concealment by defendants in support of his argument that defendants intentionally interfered with Evergreen's economic relations through fraudulent misrepresentation and fraudulent concealment. None of these is sufficient to satisfy the improper-means element of the intentional interference claim. First, the trustee asserts that defendants improperly failed to disclose to Evergreen the existence of the March 19, 2010, letter agreement between NexGen and Avion, pursuant to which Avion would potentially have a financial interest in the purchase of the aircraft from Air France. The trustee argues that "[a]s a result of this agreement," Avion began working to undermine Evergreen and toward termination

_____

[13] For this reason, I need not analyze the question whether the trustee may be estopped by virtue of representations Evergreen made in order to obtain its $15 million judgment against Avion from arguing that it was defendants rather than Avion that effected the conversion of Evergreen's deposit.

of the Avion/Air France agreements.  However, as a factual matter the trustee's argument is founded on an inaccurate premise, in that on March 19, 2010, the same day NexGen and Avion entered into the letter agreement, defendants forwarded to Evergreen a copy of their proposal to Air France, which proposal expressly and prominently indicated that the contemplated special-purpose company that would purchase the aircraft would be funded in part through an investment by Avion.  There was thus no material concealment from Evergreen of Avion's potential to take part in the contemplated purchase.  In addition, the trustee provides no evidence or argument that defendants had any obligation either to disclose or to refrain from entering into the letter agreement, without which the purported failure to disclose cannot have constituted an "improper" means of interference.  Finally, because the letter agreement expressly contemplated the assignment of Avion's purchase rights under the Avion/Air France agreements to the contemplated special-purpose company, it is logically incoherent to maintain that either the nondisclosure or the existence of the letter agreement caused Avion to terminate those same agreements.

Second, the trustee asserts that defendants "fraudulently induced" Evergreen on March 26, 2010, to extend the exclusivity period of the LOI through April 30, 2010, with the suggestion that this purported fraudulent inducement in some sense caused the failure of Evergreen's economic relationship with Avion.  Specifically, the trustee argues that defendants failed to disclose "the status and material terms" of their negotiations with Air France prior to obtaining the extension, and that this failure to disclose was fraudulent.  However, the trustee fails to establish the existence of any duty the defendants owed to Evergreen to disclose details regarding the status and material terms of the Air France negotiations.  Moreover, while defendants do not

dispute that they refrained from making Evergreen contemporaneously privy to all of the details of the negotiations, it is also undisputed that on March 19, 2010, defendants provided Evergreen with a copy of their initial proposal to Air France and of Air France's initial response thereto, and that on March 26, 2010, prior to extension of the exclusivity period, defendants provided Evergreen with a copy of an email message sent by Air France to defendants earlier that same day, indicating that Air France was still considering defendants' initial proposal. There therefore does not appear to have been any material nondisclosure prior to Evergreen's agreement to extend the exclusivity period. In addition, the trustee offers no argument or evidence in support of the conclusion that defendants' purported fraudulent inducement could have effected the complained of interference.

Third, the trustee asserts that in the course of this litigation defendants made misrepresentations regarding their reasons for not proposing a monthly lease payment that comported with the 1.67% lease rate factor contemplated in the parties' LOI, specifically that defendants were concerned about Evergreen's financial condition following Evergreen's loss of its lucrative contract with Boeing. The trustee asserts that, in reality, defendants were simply motivated to maximize their own profits. Because the motivation to maximize profits is not improper, and because defendants were not under any enforceable obligation to adhere to the lease terms contemplated in the LOI, to negotiate lease terms with Evergreen, or to disclose to Evergreen the motives underlying their negotiation positions, defendants' alleged misrepresentations regarding their motives do not satisfy the improper-means element of the intentional interference claim.

Fourth, the trustee asserts that defendants improperly failed to include Evergreen as a

recipient on all communications between defendants and Air France over the course of defendants' negotiations for the purchase of the aircraft, with the suggestion that this nondisclosure in some sense effected the complained of interference with Evergreen's economic relationship with Avion. However, it is undisputed that Evergreen at all material times was aware that those negotiations were ongoing, and that defendants provided Evergreen with periodic notifications of the general status thereof. In addition, there is no evidence or inference to support the conclusion that defendants' failure to keep Evergreen apprised in detail of their communications with Air France in any sense effected the complained of interference.

Fifth, the trustee asserts that defendants failed to disclose to Evergreen its arrangements to pay commissions to brokers associated with BDM in connection with the resale of the aircraft to a party other than Evergreen, and suggests that this purportedly concealed arrangement induced the BDM brokers to thwart Evergreen's contemplated leasing arrangement. The trustee asserts that defendants ultimately paid the brokers a total of more than $150,000 for their role in undermining Evergreen's efforts to lease the aircraft from defendants. However, under Evergreen's arrangement with BDM, the brokers stood to profit much more from successfully arranging financing on Evergreen's behalf than from assisting defendants in locating a purchaser (1% of the financed amount of the first financed aircraft, and 0.75% of the financed amount of any additional financed aircraft, or approximately $600,000 based on the actual ultimate price of the aircraft purchased from Air France). The trustee's suggestion that defendants gave the brokers an incentive to thwart Evergreen's efforts therefore appears untenable. There is also no evidence of any connection between the brokers' conduct and Avion's failure to perform its obligations under the Evergreen/Avion contracts.

Sixth, the trustee asserts that in June 2010 defendants "conspired" with Avion to induce it to send a "fraudulent" letter terminating the Avion/Air France agreements. It is undisputed that Avion sent such a letter. Although the trustee does not specify in what manner the letter was purportedly "fraudulent," the gravamen of the trustee's argument appears to be that Avion misrepresented the reasons for its inability to perform its obligations under those agreements by "purporting to blame Evergreen" therefor. Assuming *arguendo* that Avion's letter was in some sense actionable as fraud, the trustee fails to suggest any improper means employed by defendants to "induce" Avion to draft and sign the letter. In consequence, Avion's termination letter cannot satisfy the improper-means element of the intentional interference claim.

Seventh, the trustee asserts that defendants failed to disclose to Evergreen their negotiations with NAC for the resale of the aircraft. However, it is undisputed that defendants at all material times kept Evergreen apprised of their intention to resell the aircraft to a third party (without specificity) in the event the parties failed to reach agreement on lease terms. It is further undisputed that, during approximately the same time period of defendants' negotiations with NAC, defendants tendered to Evergreen a lease proposal calling for a $427,000 per month lease payment, and that Evergreen failed to accept that proposal, notwithstanding that defendants' offer was very close to the arrangement contemplated in the parties' LOI and well below the range Evergreen had calculated it could pay while still making a profit. Moreover, at the time defendants resold the aircraft to NAC, the failure of Evergreen's contemplated economic relationship with Avion was already an accomplished fact, and in any event defendants were under no obligation to disclose its negotiations with NAC to Evergreen.

Finally, the trustee's argument that defendants interfered with Evergreen's economic

relations with Avion through commercial bribery are simply unsupported by evidence of record. In support of this argument, the trustee characterizes Avion's proposed (but never consummated) 10% involvement in the special-purpose company that purchased the aircraft and defendants' commission payments to the BDM brokers as commercial bribes. However, there is a complete void of evidence that Avion (or its principal, Thorstenn) or BDM (or its brokers) were ever asked to provide any improper consideration for the payments they received, or that they ever did perform any improper acts at defendants' behest. A finder of fact could not reasonably conclude on the basis of the evidence of record that Avion's contemplated opportunity to participate in the special-purpose company (or Banyon's actual participation therein as Avion's assignee) or the commission payments to the BDM brokers could constitute commercial bribes.

For the foregoing reasons, the trustee cannot establish the requisite improper-means element of his intentional interference claim. In consequence, defendants' motion (#120) for summary judgment is granted as to the trustee's intentional interference claim.

Alternative support for that disposition may be derived from evidence establishing that Avion at all material times lacked the capacity to perform its obligations under its agreements with Air France, and for that reason could not have performed its obligations under its contracts with Evergreen at any time, without regard to defendants' complained of conduct. In similar vein, it is undisputed that the Evergreen/Avion contracts provided that Evergreen would *purchase*, not lease, the aircraft from Avion, and that Evergreen at no material time was financially capable of purchasing the aircraft from Avion (had Avion somehow acquired them) at the prices contemplated therein. While Evergreen offers the countervailing suggestion that it could have approached its creditors and Credit Suisse and obtained waivers of its covenants

against large capital expenditures and increases in its debt ratios, and/or could have negotiated additional loan financing to fund the purchase of the aircraft had Avion acquired and tendered them, such suggestion runs counter to former Evergreen CEO Timothy Wahlberg's blunt testimony that it was "impossible" for Evergreen to purchase the aircraft, and Evergreen offers no evidence that its creditors, including in particular Credit Suisse, would have considered modification of the covenants to which Evergreen at all material times was subject. Because a finder of fact could not reasonably conclude on the basis of the evidentiary record that the transactions contemplated in connection with Evergreen's economic relationship with Avion were at any material time capable of performance, the trustee cannot as a matter of law establish that defendants' conduct caused Evergreen to suffer damages. For this reason, also, the trustee cannot establish a necessary element of his claim, lending alternative and independently sufficient support for the grant of defendants' motion (#120) for summary judgment as to the intentional interference claim.

### C.    Defendants' Motion (#120) for Summary Judgment as to Evergreen's Civil Conspiracy Claim

The gravamen of Evergreen's claim for civil conspiracy is that defendants conspired with Avion "and others" both (i) to interfere with Evergreen's contracts with Avion and (ii) to breach defendants' purported fiduciary duty to Evergreen in order to acquire the aircraft for themselves and make a profit. Evergreen expressly alleges that "[t]he concerted overt acts of Defendants and Thorstenn have directly and proximately resulted in damages to Evergreen, for which Defendants and Thorstenn are jointly liable, in an amount to be determined, according to proof at trial."[14]

---

[14]  Thorstenn, principal of Avion, is not and has never been a party to this action.

First Amended Complaint, ¶ 110.  Evergreen seeks award of damages in connection with its

cause of action for civil conspiracy, independently of its separately pled torts of intentional

interference and breach of fiduciary duty.  Defendants move for summary adjudication of

Evergreen's civil conspiracy claim.

### 1. Choice-of-Law Determination Regarding the Trustee's Civil Conspiracy Claim

Each set of parties cites both New York law and Oregon law in support of its respective

position regarding the trustee's civil conspiracy claim, without suggesting the existence of any

material distinction between the applicable law of the two jurisdictions.  In consequence (as

discussed above in connection with the trustee's breach of fiduciary duty claim), I apply Oregon

law in considering the merits of defendants' summary judgment motion as applied to that claim.

*See Waller*, 174 Or. App. at 475.

### 2. Analysis of the Trustee's Civil Conspiracy Claim

Under Oregon law, "neither 'conspiracy' nor 'aid and assist' is a separate theory of

recovery."  *Granewich v. Harding*, 329 Or. 47, 53 (1999), *citing Bonds v. Landers*, 279 Or. 169,

175 (1977).  "Rather, conspiracy to commit or aiding and assisting in the commission of a tort

are two of several ways in which a person may become jointly liable for another's tortious

conduct."  *Id.*; *see also Osborne v. Fadden*, 225 Or. App. 431, 436-437 (Or. Ct. App. 2009) ("[a]

civil conspiracy is . . . not a separate tort or basis for recovery but, rather, a theory of mutual

agency under which a conspirator becomes jointly liable for the tortious conduct of his or her

coconspirators").[15]

--------

[15]  New York law is to precisely the same effect.  "New York does not recognize a
substantive tort of conspiracy."  *Jebran v. LaSalle Bus. Credit, LLC*, 33 A.D.3d 424, 425 (N.Y.

To the extent the trustee's third enumerated cause of action is intended, not to state an independent claim, but rather to allege grounds for extending liability in connection with Evergreen's causes of action for breach of fiduciary duty and/or intentional interference to any third party, it is an irrelevant procedural nonentity. To the extent the cause of action is intended to state an independent claim of conspiracy, it fails as a matter of law. Accordingly, to the extent the trustee seeks to establish defendants' liability for conspiracy, defendants' motion (#120) for summary judgment is granted as to the trustee's cause of action for civil conspiracy, and to the extent the trustee seeks instead to extend liability in connection with his separately pled claims for breach of fiduciary duty and/or intentional interference to any person or entity not named as a defendant herein, the civil conspiracy claim is stricken from Evergreen's amended complaint as impertinent. *See Ready Transp., Inc. v. AAR Mfg.*, 627 F.3d 402, 404 (9th Cir. 2010) (affirming inherent power of the district courts to strike impertinent matter from pleadings), *citing Carrigan v. Cal. State Legislature*, 263 F.2d 560, 564 (9th Cir. 1959) (discussing same).

## CONCLUSION

For the reasons set forth above, the trustee's motion (#155) to strike is denied as discussed

/ / /

/ / /

/ / /

/ / /

/ / /

---

App. Div. 2006); *see also*, *e.g.*, *MBF Clearing Corp. v. Shine*, 212 A.D.2d 478, 479 (N.Y. App. Div. 1995) (dismissal of cause of action labeled as a conspiracy "mandated by New York law" which does not recognize any such cause of action).

above, the trustee's motion (#123) for partial summary judgment is denied, and defendants'

motion (#120) for summary judgment is granted.  A final judgment shall be prepared.


Dated this 13th day of May, 2014.


 /s/ Paul Papak 
Honorable Paul Papak
United States Magistrate Judge